

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND, and )
HOWARD McDOUGALL, trustee, )
     and )
CENTRAL  STATES, SOUTHEAST AND )
SOUTHWEST AREAS HEALTH AND )
WELFARE FUND, and HOWARD )
McDOUGALL, trustee, )
      )
             Plaintiffs, )
      )
            vs. )    No.  00 C 6181
      )
TRANSPORT SERVICE CO., an Illinois )
corporation, )
      )
            Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund, Central States,

Southeast and Southwest Health and Welfare Fund, and Howard McDougall, trustee, brought

this suit to compel an audit of defendant Transport Service Company, and to recover

contributions and interest they claim are owed on behalf of certain drivers who are employees

of defendant. Plaintiffs claim that defendant was required by the collective bargaining

agreement (CBA) between Local 279 of the International Brotherhood of Teamsters and

defendant to make contributions on behalf of these drivers, who were not members of the local

but who were covered by the CBA because they operated out of defendant's Decatur, Illinois,

facility.

Plaintiffs and defendant have filed cross motions for summary judgment, both of which

are denied. In conjunction with these summary judgment motions, defendant has filed a

motion to strike the affidavit and the exhibits of Carol Evans, which is denied; and a motion to strike portions of the affidavits of three drivers, which is granted in part and denied in part. Plaintiffs filed a motion to correct certain percentages in conjunction with their motion for summary judgment, which is granted. Our reasons for these rulings are explained below.

### Uncontested Facts

In 1985, Local 279 and defendant signed a CBA covering drivers at the "covered facilities of Transport Service Co. at Decatur, Illinois."[1] As part of the CBA, defendant was required to make contributions to plaintiffs' health and welfare, and pension funds. The relevant provisions required defendant to contribute at a specified weekly rate on behalf of "each regular or extra employee, even though such employee may work only part-time under the provisions of this Agreement, including weeks where work is performed for the Employer but not under the provisions of this Agreement,"[2] as long as that employee had been on the payroll for more than 30 days. The covered employees included "any and all the employees of the Employer employed directly by and/or under the supervision and control of the Employer within the jurisdiction of the Union and who are represented by Local Union."[3] This CBA was renewed in 1988, 1991, 1995, and 1998.

In 1986, defendant made contributions to plaintiffs' funds for more than 35 drivers

---

[1] Beginning in 1988, the CBA defined the scope of covering drivers engaged in "the transportation of Food Grade Commodities and steepwater by covered employees at the Company's facility at Decatur, Illinois." After 1990, this language read, "This Agreement shall be applicable only to the transportation of Food Grade Commodities and steepwater by covered employees at the Company's facility at Decatur, Illinois" (def. L.R. 56.1 Stmt. of Material Facts ¶ 4) (hereinafter "def. SOF").

[2] The health and welfare language of the CBA in effect from August 15, 1995 through March 2, 2002, did not include the phrase, "including weeks where work is performed for the Employer but not under the provisions of this Agreement." However, that language remained in the pension provision.

[3] The CBA in effect prior to August 15, 1994 used the phrase "Local Union," rather than "Union," and also added the following phrase at the end of the referenced sentence: "or during the life of this Agreement may come to be represented by the Local Union."

("Decatur drivers") (plf. L.R.56.1 stmt. of material facts, ¶ 13) (hereinafter "plf. SOF").
Defendant did not hire any drivers after 1989 for whom it made contributions to the funds.
In 1990, defendant made contributions to the funds on behalf of approximately 20 drivers, and
that number decreased steadily every year until defendant ceased contributing for any driver
after February 2002 (*id.*). During this time period defendant continued to hire drivers who
were not union members and for whom it did not make contributions to the funds (*id.* at ¶ 15).
Defendant classified these drivers as "Indiana drivers" or "home-based drivers" (*id.* at ¶ 16).
Starting in March 1994, when defendant began renting space in Assumption, Illinois (about
25-30 miles from Decatur), defendant classified these drivers as "Assumption drivers"
(collectively, the drivers for whom defendant did not make contributions will be referred to
as "non-reported drivers") (*id.*). By 2000, defendant employed more than 40 non-reported
drivers (*id.* at ¶ 17). The Assumption facility closed in March 2002, and the Assumption
drivers were immediately reassigned to the Decatur terminal (*id.* at ¶ 98).

Plaintiffs filed suit in October 2000 to gain access to defendant's records and to conduct
an audit pursuant to the terms of the CBA and the pension and health and welfare funds trust
agreements. We permitted this audit to go forward in 2001 (see Mem. Op. and Order, 12/13/01
("Transport I")). Based on the results, plaintiffs claim they are owed contributions on behalf
of the non-reported drivers for the period from June 29, 1986, through March 2, 2002, as
follows: $2,847,807.32 to the health and welfare fund, $2,097,546.29 to the pension fund, and
$4,705,139.12 in interest.

## Jurisdiction

Section 515 of the Employee Retirement Income Security Act provides that "[e]very
employer who is obligated to make contributions to a multiemployer plan under the terms of

the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The purpose of § 515 is "to 'permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law.'" <u>Moriarty v. Muzyka</u>, 379 F. Supp. 2d 935, 948 (N.D. Ill. 2005) (quoting 126 Cong. Rec. 23029 (stmt. of Rep. Thompson)). Pursuant to § 502(e)(1) of ERISA, federal courts have exclusive jurisdiction over trustee suits to enforce an employer's § 515 contractual obligation to pay delinquent contributions. 29 U.S.C. § 1132(e)(1); <u>Central States, Southeast and Southwest Areas Pension Fund v. Old Dutch Foods, Inc.</u>, 968 F. Supp. 1292, 1296 (N.D. Ill. 1997).[4]

## History

The central issue in this case is whether the non-reported drivers are in fact carrying out the duties of Decatur drivers. If so, defendant owes plaintiffs delinquent contributions pursuant to the CBA. Exactly who is a de facto Decatur driver has proven difficult to define, as this case's lengthy history shows. Defendant has filed two previous motions for summary judgment, both of which were denied. In our first order, we made it clear that drivers at

---

[4] In a successful enforcement action under § 515, the plan shall be awarded

    (A) the unpaid contributions,
    (B) interest on the unpaid contributions,
    (C) an amount equal to the greater of: (I) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
    (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
    (E) such other legal or equitable relief as the court deems appropriate.
29 U.S.C. §1132(g)(2).

Decatur were members of the bargaining unit whether or not they were members of Local 279 (Transport I). We further held that it was "beyond dispute" that the drivers at the Assumption facility were not bargaining-unit members unless they were in fact operating out of Decatur (*id.*). However, "if a driver who is classified by the employer as an Assumption driver is in reality a Decatur bargaining-unit driver, the employer has an obligation to make contributions to fund the plaintiffs' obligation to pay benefits" (Mem. Op. and Order, 5/13/04 ("Transport II")).

In our earlier orders we did not detail the factual standards by which to determine who is a de facto Decatur driver, but we said that drivers who had very limited contact with the Decatur terminal, *e.g.*, those who only went to Decatur to have their equipment washed, were not Decatur drivers (Transport I). And, if the Assumption-based drivers hauled loads between, say, Springfield and Terre Haute, they were not Decatur drivers (*id.*). We also held that Assumption drivers who occasionally carried loads from Decatur may be permissible as foreign drivers under reciprocity provisions of the CBA (Transport II). Finally, we noted the possibility that defendant may be liable "for contributions for the time spent on any Decatur hauls, even if sporadic" -- suggesting that the non-reported drivers may not fit neatly as a single group into the "Decatur driver" or "non-reported driver" categories (Transport I).

Now that plaintiffs have concluded their audit, they claim they are entitled to summary judgment because the evidence shows that the non-reported drivers were in fact working out of the Decatur terminal both before the Assumption facility opened and after (plf. mem. in support of sum. jdgmt, p. 5). Defendant asks the court to grant summary judgment in its favor because plaintiffs have not proven that the non-reported drivers were Decatur drivers, and therefore were not part of the bargaining unit. In opposing plaintiffs' motion, it also claims

that plaintiffs have not proven that any individual drivers were working out of Decatur, but, rather, have inappropriately concluded that all non-reported drivers were de facto Decatur drivers (def. mem. in sup. of sum jdgmt, p. 6). Before we address these motions, however, we must address the parties' related motions regarding the summary judgment briefings.

### Defendant's Motion to Strike Carol Evans' Affidavit

As part of its motion for summary judgment, plaintiffs submitted an affidavit from Evans, the Division Manager of its Field Audit Division (hereinafter referred to as "Evans aff., 4/18/08"). In the affidavit she explained how she created several of plaintiffs' exhibits, including Exhs. 20-24, to which defendant objects. The data presented in the exhibits are taken from approximately 42,500 daily driver logs and 53,000 shipment registers produced by defendant during discovery (Evans aff., 4/18/08, ¶¶ 7, 18.) Evans' staff and temporary personnel entered certain fields of data from the records into Excel spreadsheets *(id.* at ¶ 9). Once entered, the data was merged into one spreadsheet to create summary charts for various categories of data: activity reported by unreported drivers (exh.19), origin city (exh. 20), destination (exh. 21), commodities hauled (exh. 22), shippers for whom drivers hauled (exh. 23), and trailers hauled (exh. 24). Evans averred that she oversaw the data entry and the auditors' review of the data entry at all stages of the project *(id.* at ¶ 12, 24).

Defendant makes several objections to portions of Evans' affidavit and plaintiffs' exhs. 19-24. First, defendant claims that plaintiffs did not comply with the provision of Fed.R.Civ.P. 56(e) requiring that "if a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."[5] Although the exhibits were filed contemporaneously with the affidavit (as attachments to plaintiffs' motion for summary

---

[5] Defendant objects on this ground to ¶¶ 7-25 and 37-42 of Evans' affidavit.

judgment), the spreadsheet Evans and her team created from defendant's records was not.

Defendant further claims that the exhibits do not meet the requirements of Fed.R.Evid. 1006,

to allow them to be considered as admissible evidentiary summaries, charts or calculations.

We will address the latter claim first.

Rule 1006 states:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The purpose of the rule is to prevent inconvenience and waste of the court's time by

presenting the contents of voluminous writings in the form of summaries, charts or calculations.

6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1006.01 (2d ed.

1997). To be admitted, the summary requires a proper foundation as to the admissibility of the

material that is summarized, and a showing that the summary is accurate. Judson Atkinson

Candies, Inc v. Latini-Hohberger Dhimantec, 529 F.3d 371, 382 (7th Cir. 2008). Although the

materials underlying the summaries need not be introduced into evidence, they must be

admissible as evidence. Weinstein at § 1006.06[3].

Defendant's first argument is that plaintiffs have not demonstrated that the documents

underlying the exhibits are admissible. The documents underlying plaintiffs' charts, drivers'

logs and shipment registers, are business records kept by defendant in the course of regularly

conducted business. They are therefore admissible as an exception to the hearsay rule.

Fed.R.Evid. 803(6). Alternatively, the records are admissible as statements made by and offered

against the defendant. Fed.R.Evid. 801(d)(2); see also S.A. Thomas v. Baca, 514 F. Supp. 2d

1201, 1210 (C.D. Cal. 2007).

Second, defendant claims that plaintiffs did not provide it with the underlying spreadsheet at a reasonable time and place, as required by Rule 1006.[6] Plaintiffs provided defendant with the final spreadsheet on May 9, 2008, approximately three weeks after they filed their motion for summary judgment.[7] Defendant requested, and was given, an extension of time to file its response. It had 21 days to examine plaintiffs' data before turning in its reply. We believe that was a sufficient length of time to check the data for accuracy. *See* Fidelity, 412 F.3d at 753 (party provided with opponent's summaries of hundreds of thousands of pages 30 days before trial had sufficient time to spot-check for accuracy). Defendant was in fact able to file its motion to strike by the extended deadline (May 30, 2008). Since the records that formed the basis for the exhibits in question belonged to defendant, we find that plaintiffs' furnishing defendant with the spreadsheet when it did was reasonable.

Third, defendant claims that the exhibits contain no assurance of accuracy. Admittedly, this is a difficult issue since plaintiffs' motion to correct certain percentages affects the exhibits at issue. But plaintiffs' inadvertently omitting some data when merging hundreds of thousands of data fields is understandable. They have acted diligently to provide the court with the most accurate data possible. The possibility that a summary might be inaccurate affects the weight given to the evidence, not its admissibility. Weinstein at § 1006.07[1]. The court is able to determine the appropriate weight of the evidence amidst allegations of inaccuracy. Greycas, Inc. v. Proud, 826 F.2d 1560, 1568 (7th Cir. 1987). Rule 1006 "does not express any 'wariness' concerning the legitimacy of summaries; the fact that they *might* be

---

[6] Note that the terms "reasonable time and place" are not defined in the rule. Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins., 412 F.3d 745, 753 (7th Cir. 2005).

[7] Plaintiffs dispute this contention, claiming they first sent defendant the spreadsheet in April 2007. They claim that the spreadsheet, sent in May 2008, was an updated version.

inaccurate is not a ground for excluding them without any determination of whether they are inaccurate." Fidelity, 412 F.3d at 753 (emphasis in original). Exhs. 19-24, therefore, are properly admissible as evidentiary charts under Rule 1006.

In light of this determination, we must next consider whether the exhibits should be excluded pursuant to Rule 56(e). In similar cases, *i.e.*, those at the summary judgment stage where the summaries were derived from material the opposing party had produced during discovery, efforts to exclude the summaries were generally unavailing. In a case very similar to this one, the plaintiff did not attach to its affidavit the spreadsheets it generated from the defendant's business records. Ameropan Oil Corp. v. Monarch Air Serv., 1994 WL 86701, *3-*4 (N.D. Ill. March 16, 1994). The spreadsheets were used to generate summaries, but since the business records were available to defendant, the affidavit was not deficient. *Id.*; *see also* Thomas, 514 F. Supp. 2d at 1210 (summary exhibits created from defendant's records were admissible, even though the underlying materials were not made available). Since the spreadsheet here was simply defendant's data compiled into one document, plaintiffs' failure to attach the spreadsheet is not grounds to exclude the exhibits. Defendant had access to the underlying records.

Defendant next argues that a significant portion of Evans' affidavit and several exhibits are inadmissible because they constitute an expert report not properly disclosed during discovery.[8] Pursuant to Fed.R.Civ.P. 26(a)(2), a summary judgment affidavit may not contain expert testimony unless the testimony has first been disclosed as such. Mannoia v. Farrow, 476

---

[8] Specifically, defendant challenges ¶¶ 7-30, 32-35, and 37-42 of Evans' 4/18/08 affidavit; exh. 5-E (chart showing the percentage of weeks defendant remitted contributions on behalf of Decatur drivers from 1985-2001); exh. 5-F (chart showing the percentage of weeks unreported drivers received compensation from 1999-2001); exh. 39 (chart showing full-time equivalencies from 1986-2002); and exhs. 19-24 (described *supra*).

F.3d 453, 456 (7th Cir. 2007). Defendant further contends that Evans' averments do not meet the standard for expert witness testimony articulated in Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993). We need not decide that question, however, because we agree with plaintiffs that Evans' averments constitute admissible lay opinion testimony.

Fed.R.Evid. 701 permits lay witness testimony in the form of opinions or inferences only where they are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Opinion testimony by a business owner or officer may be permitted without qualifying that witness as an expert because that testimony is based on personal knowledge. Compania Administradora de Recuperativos de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc., 533 F.3d 555, 560 (7th Cir. 2008). "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Id. (quoting Rule 701, advisory committee notes (2000)). This rule has also been applied to senior employees with particularized knowledge of an employer's business, especially where the knowledge is based on a review of records prepared and kept in the ordinary course of business, or perceptions based on industry experience. See e.g. Zenith Elec. Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 420 (7th Cir. 2005) (Rule 701 allows managers to offer the facts underlying projections without the need to qualify as an expert); Allied Systems, Ltd. v. Teamsters Local 604, 304 F.3d 785, 792 (8th Cir. 2002) (Vice President of Internal Audit could testify as lay opinion witness using accounting principles and methods to quantify damages where his testimony was limited to first-hand knowledge

obtained as a bookkeeper, and from a field audit); U.S. v. Hamaker, 455 F.3d 1316, 1331 (11th Cir. 2003) (experienced financial analyst did not need to be classified as an expert witness where he "simply added and subtracted numbers from a long catalogue of defendant's records, and then compared those numbers in a straightforward fashion"); Four Winds, LLC v. American Express Tax & Consulting Serv., Inc., 2006 WL 2699747 (N.D. Ind. Sept. 18, 2006) (allowing "managing member" responsible for the project at issue to offer opinion testimony on its degree of completion).

Evans' affidavit makes it clear that she possesses sufficient personal and particularized knowledge by virtue of her position at Central States to testify as a witness under Rule 701. She has worked in Central States' Field Audit Division since 1983, and is currently the Division Manager. She signed the letter dated July 31, 2000, requesting that defendant permit plaintiffs to perform an audit pursuant to the terms of the CBA and filed an affidavit in connection with this case in 2001, suggesting she has had regular involvement in this case since its inception. She oversaw the audit at all stages. Since Evans' personal knowledge comes from her review of defendant's business records and from her perceptions based on her industry experience, a sufficient foundation for her lay opinion testimony has been laid. Allied Systems, 304 F.3d at 792.

### Plaintiffs' Motion to Correct Certain Percentages

We next consider plaintiffs' motion to correct certain percentages in its Memorandum in support of its Motion for Summary Judgment and its Statement of Material Facts. Plaintiffs seek to correct certain percentages and amend exhs. 20-24 based on these corrections. Plaintiffs claim that some of the data they generated from the records defendant provided were inadvertently omitted when the data processors' spreadsheets were merged into a single

spreadsheet. In opposition to this motion, defendant essentially reiterates the arguments it makes in its motion to strike Evans' affidavit. We did not find those arguments persuasive in that context, and we do not find them persuasive here. Rule 1006 recognizes that charts, summaries or calculations may sometimes be the only practicable way to prove the contents of voluminous information. Weinstein at § 1006.02. That is the case here. Because the court's primary interest is to have the most accurate data at its disposal, and because we see no evidence that plaintiffs have deliberately sought to misrepresent the data, plaintiffs' motion to correct is granted.

<u>Defendant's Motion to Strike Portions of Drivers' Affidavits</u>

Finally, defendant wishes to exclude portions of the affidavits of union driver Joseph A. Barringer, and non-union drivers Noel Gomez and Bill W. Schrodt. Defendant objects to some statements because they are not based on the affiants' personal knowledge, and to other statements because they are hearsay, not within any exception under the Federal Rules of Evidence.

Pursuant to Rule 56(e) and Fed.R.Evid. 602, an affidavit supporting or opposing a motion for summary judgment must be based on the affiant's personal knowledge. Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003). In addition, conclusory allegations unsupported by specific facts will not suffice. Id. at 773 (citing Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 888 (1990)); see also Drake v. Minn. Mining & Mfg. Co., 134 F.3d 878, 887 (7th Cir. 1998) (holding that the district court appropriately struck portions of an employee's affidavit containing "bald assertions" about his employer, rather than "specific concrete facts," even though affiant had worked at employer's plant for a long time).

Defendant argues that certain statements in the Barringer, Schrodt, and Gomez

affidavits, in which they purport to "know" about the job duties and practices of the union and non-union drivers, are conclusory statements not based on their personal knowledge. We agree. As defendant states, there is no way that the affiants can know about all the activities of their fellow drivers over a 15-year period. These statements will therefore not be considered by the court and defendant's motion is granted as to these sentences.[9] However, the affiants' statements regarding what they did or saw (some of which are in the same paragraphs as the statements that will not be considered) are from their personal knowledge and therefore will be considered.

Defendants also argue that paragraphs 2, 17 and 19 of Gomez's and Schrodt's affidavits should be struck because they contain inadmissible hearsay in the form of statements made by defendant's employees. We disagree, and find these statements are vicarious admissions made by an agent of the defendant relating to a matter within the scope of the employment. Fed.R.Evid. 801(d)(2)(D). To qualify as an admission, the subject matter of the admission must match the subject matter of the employee's job description. <u>Aliotta v. Nat'l Railroad Passenger Corp.</u>, 315 F.3d 756, 762 (7th Cir. 2003). An admission under this evidentiary rule is admissible non-hearsay when offered against the party.

As part of its hearsay argument, defendant claims that the statements attributed to Roger Bridgman, defendant's former terminal manager, should be stricken because he is now deceased and defendant cannot cross-examine him. It is undisputed that Bridgman was employed by defendant at the time he made the statements, which fell within his job description. The fact that Bridgman is unavailable does not warrant the exclusion of his

---

[9] The sentences in which the affiants claim to "know" about the other drivers' work habits appear in ¶¶ 11, 12, 14, and 15 of all three affidavits.

statements. Under the law of agency, his statements are "presumably reliable in the absence of cross-examination because they are considered as if they were statements of the principal himself." U.S. v. Harris, 914 F.2d 927, 931 (7th Cir. 1990). The motion to strike is therefore denied as to paragraphs 2, 17, and 19 of the Gomez and Schrodt affidavits.

### Summary Judgment Standard

We now move to consideration of the parties' cross-motions for summary judgment, a finding of which is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must evaluate admissible evidence in the light most favorable to the nonmoving party. On summary judgment a court may not make credibility determinations or weigh evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The party that bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must demonstrate affirmatively that there is no genuine issue of material fact that requires a trial to resolve. Celotex Corp., 477 U.S. at 324.

Where, as here, the parties file cross motions for summary judgment, each party must still demonstrate that there are no genuine issues of material fact. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983). Each summary judgment motion must be assessed independently, and denial of one motion does not necessitate the granting of the other. Heder v. City of Two Rivers, 149 F. Supp. 2d 677, 683 (E.D. Wis. 2001), rev'd on other grounds, 295 F.3d 777 (7th Cir. 2002).

### Statute of Limitations

As an initial matter, defendant argues that plaintiffs' claims for allegedly delinquent contributions prior to October 6, 1990 – ten years prior to the commencement of this cause

of action – are barred by the applicable statute of limitations. ERISA does not contain a statute of limitations for civil enforcement actions under § 502. <u>Chicago Dist. Council of Carpenters Pension Fund v. Cotter</u>, 914 F. Supp. 237, 241 (N.D. Ill. 1996). Therefore, the courts borrow from the most analogous state statute of limitations unless doing so would be inconsistent with federal law or policy. <u>Central States, Southeast and Southwest Areas Pension Fund v. Jordan</u>, 873 F.2d 149, 152 (7th Cir. 1989) (citing <u>Wilson v. Garcia</u>, 471 U.S. 261, 266-267 (1985)). The Seventh Circuit has mandated the use of Illinois' statute of limitations for written contracts when fund trustees seek repayment of delinquent contributions. <u>Chicago Dist. Council of Carpenters</u>, 914 F. Supp. at 241; *see also* <u>Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix</u>, 283 F.3d 877, 880 (7th Cir. 2002). The parties agree that the Illinois ten-year statute of limitations for written contracts is appropriate here.

The start of the statute of limitations may be delayed, however, if the discovery rule applies. This rule, which is read into state statutes of limitations in federal question cases, "postpones the beginning of the limitations period of a federal claim from the date the party is injured to the date when the party discovers or should have discovered the injury, exercising reasonable diligence." <u>Cathedral of Joy Baptist Church v. Village of Hazel Crest</u>, 22 F.3d 713, 717 (7th Cir. 1994). The court must make an objective inquiry into the facts to determine when a plaintiff should have discovered its injury. *Id.* Whether a plaintiff exercised reasonable diligence may be a question for the court to decide if the relevant facts are undisputed and only one conclusion may be drawn from them. *Id.* at 719. The rule has been applied in ERISA enforcement cases like the one here. *See e.g.* <u>Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.</u>, 2003 WL 22175325, *1 (N.D. Ill. Sept. 19, 2003).

Defendant argues that plaintiffs' failure to conduct an audit prior to 2000, even though they knew that the number of reported drivers "steadily declined every year," shows that plaintiffs did not exercise reasonable diligence (def. combined reply in supp. of mot. for sum. jdgmt, p. 1). Since plaintiffs failed to take steps to determine whether defendant was making the appropriate contributions, defendant argues that the start of the statute of limitations should not be delayed.

Plaintiffs respond that a delinquent contribution claim under ERISA does not accrue until the funds knew or should have known of the employer's failure to make the requisite payments. They cite Jordan for the proposition that since employee benefit funds must rely on self-reporting by employers, it may take time for the fund "to discover irregularities in employer contributions." 873 F.2d at 154.[10] Plaintiffs aver that they learned that defendant was potentially misclassifying drivers on or about May 5, 2000, when they were contacted by Local 279 (Evans aff., 4/18/08, ¶ 4). They claim that defendant went to "great lengths" to hide the fact that the Assumption-based and home-based drivers were in fact carrying on the duties of Decatur drivers (plf. combined reply in supp. of mot. for sum. jdgmt, p. 14). Further, plaintiffs claim that defendant reported three new drivers between 1987 and 1989, and that it was still reporting approximately 20 drivers in 1990 (id., p. 15). Therefore, "the mere fact that the total number of drivers Transport reported to Central States was declining would not have raised any red flags" (id.). Since they had no reason to know of the potential injury, the

---

[10] This citation does not help plaintiffs as much as it would appear, since it was used in Jordan to support the idea that the ten-year statute of limitations on a written contract, rather than the five-year limitations on oral or partially oral contracts, should apply to the trustee's suit for delinquent contributions. Here, plaintiffs filed suit more than 10 years after the alleged injury occurred.

statute of limitations should not bar their claims for the period before October 6, 1990.

We believe a question of fact exists as to whether plaintiffs reasonably could not have known of defendant's under-reporting before 2000. It is true that the number of reported drivers was steadily shrinking through the 1990s. But as stated in <u>Jordan</u>, it would have taken plaintiffs a certain amount of time to notice the downward trend in reported drivers. Further, defendant does not address plaintiffs' contention that it was actively trying to conceal the true nature of the non-reported drivers' work. If that allegation is true, then it is objectively reasonable to expect that plaintiffs would not have discovered the possible injury before 2000. The question of whether plaintiffs' claims for the period between June 29, 1986, and October 6, 1990, are time-barred, will therefore be left for the fact-finder.

<u>Cross-Motions for Summary Judgment</u>

The gravamen of plaintiffs' claim is that defendant stopped labeling drivers as Decatur-based, and started classifying them as home-based, Indiana-based, or, from March 1994 on, as Assumption-based drivers, to avoid their being covered by the CBA. Plaintiffs' argument in support of summary judgment has two components: a quantitative analysis based on its audit, and a qualitative component based on affidavits and deposition testimony.

As explained above, plaintiffs' requested relief was derived from the audit they conducted of defendant's daily driver logs and shipment registers. Using those records, plaintiffs compared the Decatur drivers and non-reported drivers on certain features of the job, like origin city of hauls, destination city of hauls, and commodities hauled (*see* plf. exhs. 20-24, discussed *supra*). Plaintiffs' calculations of the delinquent contributions are based on their conclusion that all the non-reported drivers (represented as full-time equivalencies) were de facto Decatur drivers because of the degree of similarity in these job features. No driver

in plaintiffs' analysis, for instance, performed Decatur bargaining-unit work for half his or her employment, and non-covered work for the other half. Plaintiffs' damages calculations, therefore, reflect their argument that defendant owes contributions on all these employees for however long they worked for defendant during the relevant time frame (after the 30-day waiting period for all drivers) (Evans aff., 4/18/08, ¶ 27).

Plaintiffs' analysis of the shipment registers shows, among other things, that approximately 59% of the non-reported drivers' hauls either originated or ended in Decatur for the period from January 1994, through March 2002 (Evans aff., 8/18/08, ¶ 11). That figure is approximately 96% for Decatur drivers (plf. amended exhs. 20-21). The shipment registers also indicate that 96% of the trailers used by the non-reported drivers were also used by the Decatur drivers (Evans aff., 8/18/08, ¶ 12). Approximately 57% of the non-reported drivers' hauls were for A.E. Staley Manufacturing Company (which is based in Decatur), compared with approximately 95% of the Decatur drivers' hauls (plf. amended exh. 23).[11] And approximately 89% of the hauls performed by the non-reported drivers were to the same destinations as those performed by the Decatur drivers (Evans aff., 8/18/08, ¶ 13).

Plaintiffs urge us to accept their audit findings because defendant has not conducted a complete audit itself, even though the records belonged to defendant. But the Seventh Circuit has rejected this burden-shifting approach in cases where a defendant-employer is challenging the accuracy of an audit. Dugan v. R.J. Corman Railroad Co., 2002 WL 1263989 (N.D. Ill. June 5, 2002) (citing Ill. Conf. of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking, 71 F.3d 1361, 1367 (7th Cir. 1995)). A pension fund is entitled to summary judgment in situations such as the one here, only if the employer produces no evidence

---

[11] The hauls performed for Staley were of food-grade commodities.

whatsoever to challenge the results of the audit. *Id.* If the employer produces any evidence that potentially calls the audit into question, the audit results become a question of disputed fact, and summary judgment is precluded. *Id.* (collecting cases); *see also* <u>Steve Gilbert Trucking</u>, 71 F.3d at 1367 (where defendant produced an affidavit and deposition testimony asserting facts that cast doubt on the accuracy of the fund's calculations, he created "a genuine issue of material fact sufficient to withstand summary judgment as to the amount of damages.")

Defendant claims that despite the corrections plaintiffs made, errors remain. Defendant points to fifteen instances where plaintiffs omitted certain drivers' hauls or attributed hauls to the wrong drivers (def. sur-reply to mot. to strike, p. 7-9). Plaintiffs counter that these errors are minor. Even if that is true, defendant's allegations are bolstered by affidavits and deposition testimony, as discussed below. We find that defendant has produced evidence that raises a question of material fact about whether the audit is accurate. Summary judgment for the plaintiffs as to damages is therefore inappropriate.

Even if there were no question as to the accuracy of plaintiffs' audit, the findings would not be sufficient to sustain summary judgment as to defendant's liability in plaintiffs' favor. Arguably the most important factor is the percentage of non-reported drivers' hauls that either originated or ended in Decatur because that suggests the drivers were spending time and likely performing other job functions in Decatur. That figure is 59% for non-reported drivers, and 96% for Decatur drivers. While 59% is relatively high, we cannot say that any reasonable jury would have to conclude that this means the non-reported drivers were performing Decatur bargaining-unit work. Further, the difference between the percentage of hauls the non-reported drivers versus the Decatur drivers did for Staley (57% compared with 95%) may

bolster defendant's claim that the non-reported drivers were not hauling food-grade commodities with the same frequency as the Decatur drivers, which is relevant because of the scope of coverage provision of the CBA.  While the statistics show an overlap of the work between the two groups of drivers, the differences are significant enough that a fact-finder should determine whether the non-reported drivers were de facto Decatur drivers.

Plaintiffs' qualitative arguments also do not convince us that the non-reported drivers were doing Decatur bargaining unit work as a matter of law.  According to Barringer's (the union driver) affidavit, he was present at defendant's Decatur terminal at least three days per week, and often five days per week, to perform the following job duties: picking up paperwork and a trailer for a particular haul; performing a pre-trip inspection of the tractor and trailer; completing certain paperwork concerning the inspection; and turning in that paperwork to dispatch at the terminal (plf. exh. 13, ¶¶ 4, 6).  Upon completion of a haul, Barringer would return the used trailer to the Decatur terminal to be washed; perform a post-trip inspection of the tractor and trailer; and submit to Decatur dispatch a driver's log describing all activities in a given day (*id.*, ¶ 4).  He stated that he observed non-reported drivers at Decatur multiple days each week, and that they performed the same job duties that he performed (*id.*, ¶¶ 10-11).  He further stated that after the Assumption facility opened, he continued to see the non-reported drivers at Decatur with the same frequency as he had before it opened (*id.*, ¶ 18).

The affidavits plaintiffs offer of non-reported drivers Schrodt and Gomez, indicate that their job duties were essentially the same as Barringer's, and that almost all of their duties were performed at the Decatur terminal (plf. exhs. 10-11, ¶ 5).  They also averred that after they were transferred to Assumption in 1994, they were never told that they needed to be physically present there, and, in fact, went only to that facility about once a month (*id.*, ¶ 17).

Defendant rebuts this evidence with declarations of 19 non-reported drivers, all of whom are currently employed by defendant (def. exhs. P-Z, AA-GG). Although the statements are not identical, they are similar in their general averments that the drivers generally kept their tractors at home; got their assignments from the Assumption dispatchers; had conversations related to discipline, vacation requests, or resignation, with defendant's supervisors at Assumption; turned in their paperwork at Assumption; did not work out of the Decatur terminal; and did not report to supervisors or dispatchers in Decatur. In the declarations of the drivers who worked for defendant as home-based drivers before the Assumption facility opened, they stated that they kept their tractors at home and that they were dispatched by Willis Barger, who defendant claims dispatched home-based drivers only out of Decatur (see def. exhs. P, U, V, FF; def. mem. in supp. of sum. jdgmt, p. 11). One driver averred that he was hired in 1991 as a driver out of Lafayette, Indiana, before transferring to Assumption, and that he "never reported to a supervisor or dispatcher at the Decatur Terminal" (def. exh. W, ¶¶ 2, 16). While these drivers admit that they went to the Decatur terminal, it was not with the frequency that Barringer, Schrodt, or Gomez claim.

In addition to the drivers' affidavits, a review of the depositions indicates a wide gulf between the parties on the facts surrounding the duties and practices of the non-reported drivers. Some key contested facts, and a sampling of evidence to support both parties' contentions, include the following:

Non-reported drivers' presence at the Decatur terminal. Plaintiffs cite the testimony of defendant's former Decatur dispatcher, and then Decatur terminal manager, that before the Assumption terminal opened, "[p]robably 60 or 70" drivers worked out of the Decatur terminal (plf. exh. 6, p. 48). These drivers performed most of their job duties at Decatur pre-

1994 (plf. exh. 7, pp. 209-210). Disputing this assertion, defendant points to deposition testimony that the home-based drivers seldom took their breaks in Decatur, and that they generally performed pre-trip inspections at home or on the road (def. response to plf. SOF, p. 6). Defendant points to the testimony of Don Darden, defendant's vice-president of operations for the food-grade division from 1991 to 1999, that the home-based and Assumption-based drivers kept their tractors and trailers at home (def. exh. D, pp. 162-163). They also cite Barger's testimony that non-reported drivers picked up their trailers and had maintenance and trailer washing done at Decatur, as well as other terminals (def. exh. B, pp. 263, 240-241). It also cites defendant's president, Robert Schurer, who averred that the non-reported drivers "were out weeks at a time, and they lived everywhere" (def. exh. K, pp. 122-123).

Nature of the Assumption facility: Plaintiffs argue that the Assumption facility was merely an office, not a facility that could be used as a terminal. They cite to deposition testimony that the facility had no wash rack, fuel island, driver break room, or maintenance facility owned by defendant (plf. exh. 4, p. 101-102; plf. exh. 7, p. 80).[12] Defendant concedes these points, save the driver break room, which it claims did exist at Assumption and could hold 15 to 20 drivers (def. response to plf. SOF ¶ 68). Defendant argues that the Assumption facility was a fully functioning terminal, with its own profit and loss statement, general ledger accounts, and operating budget (def. SOF ¶ 13). Fuel, wash and maintenance services performed at other of defendant's terminals were charged to the Assumption facility (id.).[13]

---

[12] The parties do not dispute that Decatur, which was a fully-functioning terminal, had a wash rack with two wash bays, a fuel island, a maintenance facility staffed by defendant's employees, and a drivers' break room (plf. SOF ¶ 66).

[13] Plaintiffs object to these facts on the basis of relevance, but do not deny their accuracy.

Purpose of the Assumption facility: Plaintiffs cite Darden's testimony that he and Schurer wanted a separate facility to keep the union and non-union drivers separated because they did not want to increase the number of union drivers. "The union drivers . . . could be talking to the non-union drivers about, hey, why don't you guys join the union. That was my concern" (plf. exh. 4, p. 162). Defendant counters with Schurer's testimony that he wanted a terminal for the company's home-based drivers who, prior to that time, had not been assigned to a particular location (def. exh. K, p. 204). He also opened the Assumption facility because he wanted to grow the company's customer base by not seeming too tied to its Decatur-based customer, Staley (*id.*).

Effect of the opening of the Assumption facility: Plaintiffs cite the testimony of Richard Wilber, a former dispatcher and then site manager at Decatur, that "basically nothing" changed after the Assumption facility opened (plf. exh. 6, p. 79), and that the amount of time that non-reported drivers spent at Decatur did not change after the Assumption facility opened (plf. exh. 7, pp. 257-258). Even after the Assumption facility opened, the drivers assigned to that location picked up their bills of lading and trailers at Decatur (*id.*, p. 81). Defendant counters that once the Assumption terminal opened, the Assumption-based drivers were disciplined in Assumption (def. exh. B, p. 82); had their primary maintenance done at Assumption; turned in their pay envelopes, driver logs, bills of lading, and other paperwork to Assumption (def. exh. B, pp. 211-212); and were dispatched from Assumption (def. exh. D, p. 127).

Such broad disagreement makes summary judgment in either party's favor inappropriate, as it would require the court to make credibility determinations and weigh evidence. Just as plaintiffs have not shown that all non-reported drivers were de facto Decatur

drivers, neither has defendant shown that none of these drivers were doing Decatur bargaining-unit work. Whose argument to believe is the job of the fact-finder. Further, the divergence between the parties also suggests that the truth may lie somewhere in between their respective positions. There may be a need, therefore, to examine the non-reported drivers individually, as we pointed out in Transport I. In other cases where the issue has been whether certain employees were covered by the CBA, the courts have taken a more individualized approach.

In Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g, for example, the issue was akin to the issue here, whether certain employees were covered by the CBA. 217 F.3d 578, 580 (8th Cir. 2000). In that case the defendant engineering company, McKenzie, was a party to a pre-hire agreement with a number of different craft unions in the area. The CBA, with one of the Carpenters' union locals, required McKenzie to contribute to the plaintiff funds for "each hour worked by the employees covered by this Agreement." Id. at 582. McKenzie had employed some workers covered by that CBA, along with other employees not covered by that CBA, on two bridge-repair projects. After an audit, the funds claimed that McKenzie owed contributions for work done by employees covered by the CBA, with the Carpenters' union. But since the auditor could not verify work performed by individual employees, its calculations rested on the assumption that McKenzie owed contributions on all hours worked during the relevant period, regardless of whether the employees worked on the projects at issue or were beneficiaries of the funds. Id. at 583.

The Eighth Circuit rejected this analysis, finding that the funds' assumption that "every employee on every McKenzie project" was covered by the CBA had no basis. Id. (emphasis in original). The funds failed to explain why the defendant owed contributions "to the funds for

these hours, as opposed to owing contributions to another union's pension fund, or to no fund at all." *Id.* at 584. *See also* <u>Chicago Steel & Crane, Inc. v. Struct. Ironworkers Local No. 1 Welfare Fund</u>, 2002 WL 1610980, *6-*7 (N.D. Ill. July 22, 2002) (where employee fringe benefit fund failed to show that any employees did covered work under the CBA, it failed to prove employer's liability for delinquent benefit-fund contributions); <u>Dugan</u>, 2002 WL 1263989 at *5-*6 (where CBA covered employees who worked full-time but did not prescribe a minimum number of weeks of employment, employer owed contributions on three employees who were shown to have worked at the covered facility for one week each, but not on an employee who had worked less than full-time during two separate months at the covered facility).

We see a similar problem here to that in <u>Carpenters</u>. Plaintiffs have not explained why all the non-reported drivers should be considered bargaining-unit employees for the duration of their employment during the relevant time frame. Given the evidence, it seems possible that the non-reported drivers were performing Decatur bargaining-unit work during some weeks, months, or years, but not others. Based on the summaries plaintiffs have provided, it is impossible to tell whether, for example, there were certain Assumption-based drivers whose hauls originated or ended in Decatur 96% of the time (like the Decatur drivers), and others for whom that figure is merely 20%. If that were the case, then defendant may well owe contributions on the former group of drivers, but not the latter. As this case moves forward, plaintiffs will need to explore this possibility or explain why an individualized approach is unwarranted.[14]

---

[14] It is also possible that this individualized approach is not feasible, given that defendant did not supply plaintiffs with records covering the entire period in question. But it at least should be ascertainable for the years 1994 to 2002, the years for which defendant produced shipment registers.

## Conclusion

For the foregoing reasons, defendant's motion to strike the Evans affidavit and exhibits is denied; plaintiffs' motion to correct certain percentages is granted; defendant's motion to strike portions of the affidavits of the three drivers is granted in part and denied in part; and the parties' cross-motions for summary judgment are denied.

*James B. Moran*

JAMES B. MORAN
Senior Judge, U. S. District Court

February 17, 2009.